Receipt No 006993

ORIGINAL

FILED
AUG 1 6 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

PHOENIX INDUSTRIAL CONTRACTORS, INC.

Plaintiffs,

v.

THE UNITED STATES OF AMERICA

Defendant.

Civil Action No.: 07-611 C

**COMPLAINT**

Plaintiff Phoenix Industrial Contractors, Inc. by the undersigned counsel, files this Complaint against the United States of America, and alleges as follows:

**JURISDICTIONAL STATEMENT AND PARTIES**

1. Jurisdiction is conferred by 28 U.S.C. § 1491.

2. This action is brought pursuant to the provisions of 41 U.S.C. § 609.

3. Phoenix Industrial Contractors, Inc. ("Phoenix") is a small business located in Dover, New Hampshire.

4. The United States Department of the Interior is an Executive Department of the United States. The National Park Service is a Bureau of the Department of the Interior. The Lowell National Historic Park is a Park within the National Park Service.

Defendant, the United States of America, acting by and through the Department of Interior, a federal agency, is a body politic authorized by law to enter into contracts for the procurement of goods and services.

**CONCURRENT LEGAL PROCEEDINGS AND BACKGROUND**

5. This Complaint is being filed as a protective measure in the event of a jurisdictional challenge at the Civilian Board of Contract Appeals ("Board") concerning an appeal involving

these same claims. On March 19, 2007 Plaintiff filed two appeals with the Board, which Appeals are docketed as CBCA #'s 680 and 681. By way of explanation, Plaintiff states:

6. On April 6, 2006, Phoenix submitted a detailed claim to the contracting officer for the release of liquidated damages effective August 5, 2002, in the amount of $42,105.00, plus interest. As of March 19, 2007, the contracting officer had failed to respond, issue a final decision, or release the retained liquidated damages. On that date, Phoenix filed an appeal with the Board based on the contracting officer's deemed denial of its claim (41 U.S.C. § 605(c)(5)). The issue of liquidated damages is not a part of this action.

7. On June 19, 2006, Phoenix submitted a certified claim to the contracting officer in the amount of $1,256,823.00. The certified claim, which was presented through sixteen discrete elements, summarized its damages for those sixteen elements in nine specific areas:

| **Claim Element** | **Claimed Damages** |
|---|---|
| | |
| Indemnification-Constructive Suspension | $60,598 |
| Access Restriction-Delay | $961,830 |
| Dutchmen-extra work | $28,334 |
| GRW concrete topping-extra work | $44,033 |
| Gate house-extra work | $10,483 |
| Island "A" -extra work | $36,365 |
| Mod 2-truss-extra work | $97,020 |
| Mod 3-loam/fence-extra work | $5,660 |
| Mod 5 alleged defective work | $12,500 |
| **Total Claim** | **$1,256,823.00** |

8. In response to that $1,256,823.00 certified claim, the contracting officer issued a series of piecemeal letters purporting to be final decisions beginning on August 17, 2006 through December 21, 2006:

a. Indemnification-Constructive Suspension: denied on November 28, 2006;
b. Access Restriction-Delay: denied on December 21, 206;

c. Dutchmen-extra work: denied on August 17, 2006;
d. GRW concrete topping-extra work: denied on August 17, 2006;
e. Gate house-extra work: denied* on August 17, 2006;
f. Island "A" -extra work: denied* on August 18, 2006;
g. Mod 2-truss-extra work: denied on August 18, 2006;
h. Mod 3-loam/fence-extra work: denied* on August 18, 2006;
i. Mod 5 alleged defective work: denied on August 18, 2006;

*Within these particular 'final decisions' which purported to deny the relevant element of the claim, the Contracting Officer simultaneously left final determination of the element and the claim open to future adjustment pursuant to "a separate final Decision by the Contracting Officer" and "a credit . . . not claimed by the Government at this time."

7. Despite the contracting officer's having issued eight so-called 'final decisions' prior to issuing her December 21, 2006 final decision, those decision letters failed to address even 20% of Phoenix's claim.

8. Given that the certified claim was for a sum certain ($1,256,823.00), was presented as a comprehensive and integrated package to the contracting officer, and was not addressed as to its vast majority or entirety until December 21, 2006, Plaintiff filed a timely appeal with the Board on March 19, 2007, contending that the appeal was timely filed for all claims submitted to the contracting officer. Plaintiff contends that such filing was timely pursuant to 41 U.S.C. § 606 as to the entirety of the claim.

9. In the event, however, that the government may assert that the Appeal to the Board was untimely as to those claims for which a 'final decision' had been issued prior to December 21, 2006, Plaintiff has filed this action with the Court to avoid unnecessary jurisdictional arguments before the Board. Given that the first of the 'final decisions' was issued on August 17, 2006, this action is timely filed.

10. Plaintiff is requesting that the Court order that this proceeding be transferred to the Civilian Board of Contract Appeals and consolidated into Appeals 680 and 681.

## CONTRACT BACKGROUND

11. The Lowell National Historic Park, National Park Service, U.S. Department of the Interior (hereinafter "LNHP" or the "Government") issued Solicitation No. IB1780-00-01 for the "Rehabilitation of Northern Canal Walk, Phase II," LNHP, (hereinafter the "Project") on or about March 20, 2000.

12. The Scope of Work for the Northern Canal Phase II (NC2) Project work is principally divided into:

I. Island at School Street Bridge (referred to by LNHP as "island") consisting of reworking existing stone stair, railings, stone dust walkway, gate and re-landscaping a treed and overgrown, two (2) acre island between the Merrimack River and the Northern Canal (construction equipment access is via the School Street Bridge or via marine float/barge but is limited as to the size of marine craft that will fit through the canal lock).

II. Great River Wall (GRW or Great Wall) work.

a. GRW hand rail railings, gate, removal and replacement of certain stone work ("Dutchmen" or "deadmen"), rehabilitate concrete walkway atop Great Wall and vegetation removal;

b. Gatehouse stone work, steel work, decking, railings, and carpentry entry work;

c. Weir - steel work, decking and railings spanning the existing cast iron weirs,

d. Work on the island [labeled as Island "A" by Phoenix] between the weir and Boott's overflow protection device called the "surge gate";

e. Wheelchair ramps atop the Great River Wall (GRW) – three (3) required, which are all within the access denial threshold of 3500 cfs; and,

f. Rig into place an existing 140ft long walkway truss (referred to by LNHP as "bridge #1") across the Northern Canal on to existing abutments, which was constructed under a 1995 NC1 contract with Orion Construction of Texas. Orion's contract included the installation of "bridge #1" across the Northern Canal. Orion delivered, but Hydropower, Inc. ("Boott") [owner of parts of the project site and adjacent land] would not allow the Government to install "bridge #1" across the

canal at that time in 1995, because Boott was installing a "surge gate" during the canal low flow "construction season" period from July through October. The Government directed Orion to place "bridge #1" on the lawn of the University Massachusetts (UMass) Lowell dormitory, where it will sit exposed to weather for the next five (5) years until the award of the contract to Phoenix. The LNHP is responsible for furnishing and delivering to the jobsite the "bridge #1" anchor bolts, bearing pads and two gate leafs complete with all attachments and mounting hardware.

13. Section 01010, 1.02 A of the Contract states:

*"1.02 Project Area Limits and Adjacent Site Occupancy. A. ...Certain parts of the project site and adjacent land is either privately owned or owned by another governmental agency, and the entire canal channel itself is privately owned. The Government has obtained rights of temporary occupancy or passage upon or over these canal waters and across these adjacent land areas under set conditions and for restricted periods of time during the duration of the project upon Contractor satisfaction of contract – specified coordination, control and indemnification requirements contained below. The Contractor shall initiate and arrange such project and adjacent site occupancy with the private owner involved, Boott Hydropower, Inc. in consultation with the Contracting Officer."*

14. The contract advised bidders that the optimal times to work in the canal would be in July through October when the flow rate in the canal was less than 3500 cubic feet per second 60% to 75% of the time. *See* 1.04 B of Section 01010, Amendment No. 2, pp 4-5. Since the contract was bid June 14, 2000, bidders could reasonably assume that this optimal working season in the canal would be made available the first summer of the Project.

15. A Pre-Bid Conference for this Solicitation was held at the Lowell National Historic Park on April 5, 2000. As a part of that Pre-Bid Conference, prospective bidders were taken on a walk through of the work site. During this walk through, the contracting officer would not allow bidders to go/walk atop the Great Wall or physically inspect the gatehouse, weir, and Island "A." because the flow rate of the canal was too high. Subsequent to the Pre-Bid Conference, Phoenix inquired of the contracting officer, in writing, on April 20 2000, "please advise...when we can view inside the structure which is located between the canal and the

river…". The contracting officer's response on April 21, 2000 states, "there is currently no access due to flow rates – this will be addressed in addendum."

16. On June 1, 2000, LNHP issued Amendment #002 to the solicitation stating the new bid date is 6/14/00. The Amendment also stated that the "Waste Gate House will not be available for inspection . . . until river flow falls below the access limit stated in this Addendum."

17. Amendment 2 also set out and clarified in Section 1.05 the various representations made by LNHP as to contractor site access from marine, land, streets, and bridges adjacent to the work site.

18. By the date of bid opening (June 14, 2000), bidders had not been allowed access to inspect the working area and actual site conditions; to review in person those areas and ask for clarifications of the various work aspects/engineering/rework of those same areas; or to review actual conditions of access/vegetation/ledge/soil/interferences/stone work/building construction and seek clarifications of those very same areas prior to bid.

19. Bid opening was conducted on June 14, 2000. The Project was awarded to Phoenix under Contract No. C1780-00-004 on June 21, 2000, in the amount of $890,537.00.

**INDEMNIFICATION DELAY**

20. While the Contract was awarded June 21, 2000, Phoenix could not obtain access to key elements of the Project owned by Boott. As described about in ¶ 5, Section 01010, 1.02A of the Contract tells the Contractor that certain parts of the Project site and adjacent land is either privately owned or owned by another governmental agency and the entire channel is privately owned. The Contractor is to initiate and arrange Project and adjacent site occupancy with the private owner Boott in consultation with the Contracting officer.

21. At ¶ 1.04, A.1 of the contract specification is the indemnity language to be provided to Boott by the Contractor. LNHP failed to obtain Boott's agreement on the indemnity language specified in the contract before the solicitation indemnity language was prepared.

22. Phoenix was unsuccessful in obtaining information on access from Boott beginning June 13, 2000.

23. Not until July 12, 2000 did LNHP arrange a meeting with Phoenix and Boott. Boott raised during this meeting a number of access limitations not specified in the contract. Nothing was discussed during the meeting concerning indemnification.

24. On July 22, 2000 Phoenix forwarded to LNHP proposed indemnification language in compliance with the language specified in the contract.

25. LNHP made some minor modifications to the form and Phoenix signed and forwarded the LNHP revised indemnity agreement to LNHP on August 8, 2000.

26. On September 1, 2000, LNHP informed Phoenix that Boott wanted to add an attorneys' fees clause which was not a part of the contractually specified indemnity language.

27. On September 8, 2000, LNHP issued a Notice to Proceed to Phoenix. However, Phoenix could not proceed per LNHP until the indemnity language was approved.

28. On September 27, 2000, LNHP approved the indemnity submittal. On September 29, 2000 LNHP hand-delivered the approved submittal to Phoenix. At that time, Phoenix is authorized for the first time to inspect the GRW, gatehouse, weir, and Island "A" work areas, which became practically available on Monday, October 2, 2000.

29. The LNHP should have given approval of Phoenix's indemnity letter within seven (7) days after receipt on July 22, 2000, i.e., by July 29, 2000. Thus, Phoenix was constructively suspended from being provided access to the jobsite from July 30, 2000 to

October 2, 2000 – a total of 64 calendar days. Phoenix is also entitled to a 21 day compensable contract time extension for the period between the NTP date of September 11, 2000 and October 2, 2000.

## GREAT RIVER WALL ("DUTCHMAN" AND CONCRETE TOPPING)

30. LNHP issued defective specifications concerning the removal of portions of the GRW granite stones. The contract required at Section 04400, Stone Masonry, that Phoenix replace broken capstones at selective railing post locations with matching replacement stone called "Dutchman." Paragraph 3.03 of the Stone Masonry specifications called for the removal of "mortar" around the existing granite blocks to be removed.

31. Phoenix could not remove the cracked or damaged stone as it contemplated because the joints were not constructed of mortar. Rather, they were constructed of hydraulic cement. Thus, the stone could not be slid out once holes were drilled. Rather, Phoenix had to remove pieces through a much more expensive method of chiseling, and jack hammering, off of floats in the canal.

32. By letter dated July 23, 2002, Phoenix advised LNHP that the stones were grouted into place and not dry set as indicated by the contract specifications. Thus, the work was extremely difficult. Phoenix asked for advice from LNHP.

33. LNHP instructed Phoenix to drill out on the top eight inches of the capstones instead of popping the whole stone as indicate in the contract.

34. Phoenix spent $28,334 in additional direct costs to perform this additional work. Phoenix is also entitled to recover an additional 25 low flow rate work days to perform the extra work.

35. In addition, the contract specified at Drawing L-3.3 the use of sandblasting to remove decomposed, fractured and layered existing concrete on a walkway on top of the GRW. The specifications were defective because the decomposed material could not be removed by sandblasting. Instead, Phoenix had to employ more expensive chipping hammers and jack hammers to remove the material. In addition, because of LNHP delay, Phoenix had to install more concrete than contemplated by the contract documents.

36. Prior to bid, Phoenix was denied access to walk on top of the GRW to inspect. After contract award, Phoenix and its subcontractor were denied access to the area for 102 days. As a result, Phoenix lost its first subcontractor to do the work, J&A Concrete Pumping and Grouting, Inc. Not until October 2, 2000 did Phoenix obtain access to the area. As a result, Phoenix had to pay $17,818 more to contract a replacement subcontractor.

37. Subsequently, Phoenix learned that access from a landing at the foot of Falls Street was not available as represented in ¶ 1.05 of the contract. Rather, it was a right of way undisclosed to bidders. Boott had to agree to such access.

38. In addition, Boott lowered the canal by 10-12 feet in depth in September and October 2002 making it impossible for Phoenix to access the work on those days to place concrete. Not until October 22, 2002 did Boott raise the canal sufficiently to allow Phoenix to place concrete topping on the GRW.

39. Phoenix is entitled to recover $44,033 in direct costs for this additional work and 23 low flow rate days to perform the extra work.

**DEFECTIVE SPECIFICATIONS INVOLVING THE GATEHOUSE**

40. On April 5, 2000 and April 20, 2000, bidders were denied access to inspect the Gatehouse. Not until October 10, 2002 was Phoenix given access to the Gatehouse. It was locked from October 2, 2000 to October 10, 2000.

41. From October 22, 2000 to October 24, 2000, Phoenix provided notice to LNHP that the flow rate of the canal was excessive causing flooding/overtopping in the gatehouse and weir areas-a condition not disclosed in the contract.

42. By November 6, 2000, LNHP has delayed preparation of gatehouse shop drawings due to denied of access to the gatehouse.

43. On February 7, 2001, Phoenix submitted its proposed gatehouse details which would allow field drilling/punching of new structural steel eliminating the requirement to have physical access to the gatehouse in order to check the dimensions/anchor bolt locations. LNHP and its architect TAMS delayed the review of these drawings.

44. On March 22, 2001, Phoenix submitted gatehouse steel beams in submittal number 15. Phoenix received approval on April 28, 2001 – 17 days late allowing for a 20 day review by LNHP.

45. Thereafter Phoenix was delayed access to the site by a tenant of property behind 22 School Street where Phoenix was planning to load the gatehouse steel onto boat floats. Phoenix was denied access on days when the Boott facility was not staffed. Boott did not cooperate and lower the canal level so Phoenix could work on the floor level of the gatehouse. It was flooded – on a random basis in July 2001. Boott also raised the flow rate of the canal to over 3500 cfs denying Phoenix access in July 2001.

46. In addition, LNHP delayed Phoenix by failing to approve timely Phoenix's proposed bolt hole locations and procedures in the gatehouse floor granite blocks. In addition, LNHP delayed Phoenix's installation concerning (a) installation of rod anchors; (b) the use of "shims" under longitudinal beams; and (c) the improper imposition of pull out testing for the newly installed stainless steel threaded rod anchors.

47. On August 31, 2001, LNHP requested Phoenix to submit a proposal to replace steel shims with stainless steel washers. Phoenix submitted its proposal on September 10, 2001. Rather than proceeding with this proposal, LNHP proceeded to instruct Phoenix on September 19, 2001 to set the four steel beams to grade without shims and grout the area between the bottom of the 4 steel beams and existing granite floor blocks. On September 20, 2001 LNHP asks for a proposal for the grouting.

48. In October 2001, Boott denied Phoenix marine access by closing the gates which LNHP acknowledged in an October 2, 2001 email the COTR, Mr. Parrott, wrote to Mr. Aucella, Ms. Dolce (CO) and Mr. Davis that "Caton will probably have good cause to claim delay" when Boott closed the gates and when Boott intends to start building its cofferdam at the spillway a week later. Mr. Parrott also acknowledged on October 2, 2001 in an email to Inspector Scott that LNHP contractually owed Phoenix access whenever the flow rate was less than 3500 cfs.

49. Thereafter from October 2001 through December 4, 2001, Phoenix was intermittently delayed access to the gatehouse to work. LNHP is liable for all these delays and for $10,843 in direct costs to perform gatehouse steel work outside the scope of the contract documents.

**WEIR DELAYS**

50. In addition, LNHP delayed Phoenix in the installation of the weir templates. These delays were concurrent with other Project delays. These delays involve weir shop drawings, weir beam holes, beam gusset spacing, weir steel layout, weir stone interferences, and denial of access to the work areas at the weir. In an April 10, 2002 email from Mr. Parrott (COTR) to Ms. Dolce (CO), Mr. Parrott notes "...I think it would be wise to set aside fairly large bags of money now to prepare for the eventual settlement with the contractor." The concurrent compensable delay to Phoenix weir work through October 22, 2001 equals 755 calendar days.

**ISLAND "A" DELAYS**

51. The contract drawings required the removal of an existing concrete walkway on Sheet L-1.6 for Island "A". Note 13 stated:

> Assume that the thickness of existing paved areas indicated for removal are o the minimum standard for the pavements current use.

52. The government estimate for removing this sidewalk was $602.74.

53. Per note 13, Phoenix reasonably anticipated the sidewalk to be 3" of unreinforced concrete. Phoenix encountered existing concrete from 11" to 18" thick, with steel reinforcing and wire mesh. Phoenix also found ledge underneath the existing concrete which had to be removed.

54. Phoenix was intermittently denied access to this work location as well.

55. Bidders were denied pre-bid access to inspect the sidewalk.

56. On October 12, 2000, Phoenix started demolishing the concrete sidewalk and found that it was not 3" thick, but was 11" to 18" thick, with reinforced steel in the slab.

57. Throughout the fall of 2000, Phoenix was denied access at various times to this work area.

58. A winter shut down occurred from December 7, 2001 to April 23, 2001. Not until July 13, 2001 is the canal's flow rate under 3500 cfs which allows Phoenix to work in the area. Phoenix intermittently worked on Island "A" as permitted through the rest of the year subject to extra-contractual access restrictions.

59. In April 2002, Phoenix was ready to resume work on the walkway. On April 12, 2002 the COTR, Mr. Parrott, wrote the CO, Ms. Dolce, and stated that Phoenix was being denied access to the area and that "...I would be unable to defend a claim regarding lack of access to that area, because the contract implies that work can be done there when the flow rate is above 3500 cfs." Through November 2002, Phoenix was intermittently denied access to that work area even though LNHP acknowledged internally that Phoenix had the right to expect access to that work area.

60. Phoenix was delayed a total of 613 calendar says in working on that area. Phoenix is entitled to recover $36,365 in additional direct costs to remove the concrete walkway and ledge materials underneath it. Phoenix is also entitled to recover an additional 45 low flow rate work days to perform the extra work and impact costs.

## GOVERNMENT FURNISHED GATE DELAYS

61. Contract drawing L-3.6 states in two places "Install Government furnished, fabricated gates on exst. end post."

62. On April 24, 2001, Phoenix requested Mr. Parrott to deliver the government material.

63. On September 5, 2002, LNHP tells Phoenix some details on Gate 3 have different connections than the other gates.

64. On August 31, 2004, when LNHP issued a cure notice to Phoenix, Phoenix was still waiting for delivery of two GF gate leafs which were to be welded onto the end of Bridge #1.

65. Not until September 29, 2002 did Mr. Parrott advise Phoenix that the government furnished gate leaves for the East abutment were available for pick up. However, by then all of Phoenix's equipment was off the site. Therefore, on November 1, 2004, LNHP indicated that it would be deleting the installation of these gates from the contract.

**<u>LNHP KNOWINGLY ISSUED A CONTRACT WITH UNRESOLVED ACCESS ISSUES BECAUSE OF LIMITED FUNDING</u>**

66. In an April 17, 2000 email, Mr. Parrott wrote to Mr. Aucella about access issues which occur "randomly and of essentially unknown duration" which "will not permit any definitive schedule to be followed." Bidders were not advised of these access limitations.

67. On April 17, 2000, Mr. Aucella wrote to Mr. Parrott about the need " to commence the bid process and do the project or else we will lose funding."

68. On May 4, 2000, Mr. Parrott wrote to Boott requesting access information. He did not get it. Yet LNHP issued Amendment #002 to the solicitation on June 1, 2000 with wrong/incomplete access information. The government had not obtained from Boott the rights of temporary access represented in the Amendment. Rather, Boott wrote to LNHP on June 1, 2000 that "It may be best to wait until you have a contractor 'on-board' before we get into the specifics of the access issues." Yet LNHP failed to warn bidders that access details had <u>not</u> been arranged with Boott.

69. Throughout contract performance, LNHP acknowledged internally that access issues delayed Phoenix as detailed in ¶ ¶ 10-20 at pp. 138-142 of Phoenix's June 19, 2006 claim.

**UNILATERAL CONTRACT MODIFICATION #002, BRIDGE #1 INSTALLATION**

70. The contract contemplates and Mr. Parrott told bidders on the pre-bid walk through that the contractor would use the Boott parking lot to rig Bridge #1 (supplied by LNHP) onto floats in the canal.

71. In a July 12, 2000 meeting, Boott told LNHP and Phoenix "we will not allow you to use our parking lot to install the bridge."

72. Phoenix cooperated by suggesting a different plan to rig and move the bridge, which was extremely difficult. Phoenix proceeded to move the bridge without the use of Boott's parking lot.

73. In June 2001, Phoenix submitted a preliminary cost proposal and the COTR wrote the CO in a June 18, 2001 email "I doubt if we'll win this one in mediation."

74. LNHP proceeded to arbitrarily price the value of the change order work.

75. On September 10, 2001, the CO issued unilateral contract modification #0002 or $69,011 with a 30 calendar day time extension. This amount was arbitrarily determined by LNHP.

76. Phoenix is entitled to recover $97,020 more than the amount allowed for in LNHP's unilateral change order and an additional 67 work days to perform the change order work.

**UNILATERAL MODIFICATION #003, FENCE UPGRADE AND ADDED LOOM/FILL**

77. On September 27, 2001, the CO issued a unilateral modification for "fence upgrade and fill" for an amount of $10,317. This change order was arbitrarily priced by LNHP as it failed to take into consideration 18" of existing loam thickness and the 2/3 loss of that soil by screening of debris.

78. Phoenix is entitled to recover $4,660 more than the amount paid for in Unilateral Modification #3.

**LNHP'S DEFECTIVE WORK CLAIM/CHARGE – UNILATERAL CONTRACT MODIFICATION #005**

79. On November 13, 2002, Phoenix wrote LNHP that it considered the Project substantially complete as of November 10, 2002. LNHP failed to promptly inspect and prepare a punch list in accordance with Section 01700, ¶ 1.06E of the contract.

80. LNHP did not prepare a punch list until November 29, 2004 – some 747 days later – a patently unreasonable time period. The punch list provided then was unreasonable and arbitrary. Phoenix responded to LNHP why the punch list was arbitrary and unreasonable.

81. LNHP issued unilateral modification #0005 for $12,500 for alleged incomplete punch list work. LNHP is not entitled to any of this credit.

**PRAYER FOR RELIEF**

WHEREFORE Phoenix respectfully requests the Court Order this matter be transferred to the jurisdiction of the Civilian Board of Contract Appeals and consolidated into the Board's docketed cases numbers 680 and 681; or, in the alternative, award Phoenix its damages as stated above plus CDA interest; attorneys' fees; costs; and such and other relief as the Court deems just.

Respectfully submitted,

Dated: August 16, 2007

DOUGLAS L. PATIN
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
(202) 719-8241 (office)
(202) 719-8341 (fax)

Counsel for Plaintiff
PHOENIX INDUSTRIAL
CONTRACTORS, INC.